WO                                                                                KAB

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Emma Ochoa Toledo, as a wrongful death beneficiary on her own behalf and on behalf of all statutory beneficiaries, et al.,

Plaintiffs,

v.

Andrew Palafox, et al.,

Defendants.

No. CV-24-00195-TUC-CKJ

**ORDER**

Plaintiff Emma Ochoa Toledo, as a wrongful death beneficiary on her own behalf and on behalf of all statutory beneficiaries, and Edgar Casahonda, on behalf of the Estate of Edrei Ochoa, who are represented by counsel, brought this action pursuant to 42 U.S.C. § 1983 and Arizona state law.  Defendants move for summary judgment.  (Doc. 35.)  Although the Court granted Plaintiffs four extensions of time to file a response (Docs. 41, 43, 45, 47), Plaintiffs did not file a response or seek additional time to file a response.

## I.      Background

In the Complaint, Plaintiffs allege five counts against Defendants.  In Count One, Plaintiffs allege assault and battery resulting in wrongful death of Edrei Ochoa ("Ochoa"), against Defendants City of Nogales Police Officer Palafox ("Palafox"), City of Nogales Police Officer Serrano ("Serrano"), and the City of Nogales (based on vicarious liability).

In Count Two, Plaintiffs allege negligent supervision against the City of Nogales.  In Count Three, Plaintiffs allege Fourth Amendment excessive force against Defendants Palafox and Serrano.  In Count Four, Plaintiffs allege *Monell* claims against the City of Nogales based on failure to train.  In Count Five, Plaintiffs allege a Fourteenth Amendment loss of family relationship claim against Defendants Palafox, Serrano and the City of Nogales.

Defendants assert that they are entitled to summary judgment because Palafox and Serrano did not use excessive force, Palafox and Serrano are entitled to qualified immunity as to the excessive force claim because there was no excessive force, there is no support for a *Monell* claim, there was no conduct shocking the conscience to support that loss of family relationship claim, and the state law claims are unsupported because the use of force was justified.

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

Additionally, where a response to a motion for summary judgment is not filed, it should nonetheless be denied "where the movant's papers are insufficient to support that motion or on their face reveal a genuine issue of material fact." *See Henry v. Gill Industries, Inc.*, 983 F.2d 943 (9th Cir. 1993); *see also* L.R.Civ. 7.2(i).

Because they did not respond, Plaintiffs have failed to go beyond the pleadings and set forth specific facts that show there is a material issue of fact for trial. The Court will review the record to determine if Defendants' evidence is sufficient to support a grant of summary judgment.

### III.    Facts[1]

On April 8, 2023, Defendant Nogales Police Sergeant Palafox was one of the police recipients of an email from Nogales Police Sergeant Amador Vasquez advising that Ochoa was back in Nogales and to be on the alert. (Doc. 36 ¶ 3.)

On the night of April 10, 2023, Defendant Sergeant Palafox, who was wearing his Nogales Police uniform, purchased a burrito from a food truck in the vicinity of the Circle K in a congested, heavy traffic, commercial area in Nogales. (*Id.* ¶¶ 4, 49.) Ochoa drove up to Palafox's marked police car and advised Palafox that "you're safe. I've got this place

---

[1] Because Plaintiffs did not controvert any of Defendants' facts, the Court considers Defendants' supported facts undisputed. *See* Fed. R. Civ. P. 56(e)(2)-(3).

under surveillance. I'm under cover right now." (*Id.* ¶¶ 5, 49.) Palafox watched Ochoa drive to the Circle K parking lot, retrieve body armor from his trunk, and put the body armor on. (*Id.* ¶ 6.) Palafox drove and parked his car directly behind Ochoa's car. (*Id.* ¶ 7.) Based on his criminal conviction history, Ochoa was a prohibited possessor of body armor and a gun in violation of A.R.S. § 13-3116 and A.R.S. § 13-3102(A)(4), both Class 4 felonies. (*Id.* ¶ 8.)

Palafox asked Ochoa what he was doing with body armor and directed Ochoa to step out of the car. (*Id.* ¶ 9.) When Ochoa got out, he spun around and Palafox noticed the handle of Ochoa's gun in a holster on the side of his right hip. (*Id.*) Palafox attempted to put handcuffs on Ochoa, but Ochoa resisted. (*Id.* ¶ 10.) Palafox saw the handle of Ochoa's gun, asked Ochoa if he had any weapons and Ochoa falsely stated he did not. (*Id.* ¶ 11.) Ochoa grabbed the handle of his gun, but his oversized jacket prevented him from actually grasping it. (*Id.* ¶ 12.) Ochoa spun around immediately preventing Palafox from putting a handcuff on his right arm. (*Id.* ¶ 13.) Palafox was unable to keep hold of Ochoa's right wrist because Ochoa was stronger than him. (*Id.* ¶ 14.) Ochoa put his arm in front of him and then reached for his gun. (*Id.*) Palafox used both his hands to push down on Ochoa's hand to prevent him from getting the weapon out. (*Id.*)

Ochoa reached for his weapon and grasped his weapon. (*Id.* ¶ 15.) Palafox was focused on not letting Ochoa pull out his weapon. (*Id.* ¶ 16.) Palafox repeatedly commanded "Don't take it out," "Don't do it. Don't do it." (*Id.*) Ochoa broke loose and got in front of Palafox and put his arms up. (*Id.* ¶ 17.) Palafox felt that he was "going to die." (*Id.* ¶ 17.) Palafox commanded Ochoa, "Get on the ground"; "Get down on your belly. Put your arms to the side." (*Id.* ¶ 18.) Ochoa just stood there looking at Palafox. (*Id.*) Palafox got on the radio and City of Nogales Police Officer Kavathas arrived on scene. (*Id.*)

Palafox was pointing his gun at Ochoa and Officer Kavathas had a taser pointed at Ochoa. (*Id.* ¶ 19.) Ochoa was complying with commands with both eyes fixed on Palafox, alternating between a smile and seriousness. (*Id.*) Ochoa moved his arms above his head

and then would bring them down and, at one point, he gestured like he was going to grab his gun. (*Id.* ¶ 20.)  Palafox commanded, "don't grab it. Don't grab it, lower yourself to the ground, get on your belly, get on your belly." (*Id.* ¶ 20.)  Ochoa would lower to one knee in response to commands and then just "pop right back up." (*Id.* ¶ 22.)

Defendant Nogales Police Officer Serrano arrived with the K9 unit. (*Id.* ¶ 25.) Officer Serrano was able to see a gun on Ochoa's hip. (*Id.* ¶ 56.)  Officer Serrano knew that Ochoa was a prohibited possessor. (*Id.*)  Ochoa was moving his arms up and down and putting his hands close to the gun on his waist and Officer Serrano told everyone to calm down and he would get his dog. (*Id.* ¶ 58.)  Officer Serrano first commanded the K9 to lie on its stomach flat on the ground and commanded Ochoa to get on the ground. (*Id.* ¶ 59.)  Officer Serrano said "I don't want my dog to bite you." (*Id.*)   Palafox told Ochoa to get on the ground and "we don't want to harm you." (*Id.*)  Officer Serrano stated "we have a gun. We don't know what can happen what could trigger this." (*Id.*)  Ochoa had a knife in his right hand and Officer Serrano released the K9. (*Id.*)  Ochoa did a turning-rolling type move that caused the K9 to not bite him. (*Id.*)

Palafox saw Ochoa reach into his pocket and grab a knife and snap the blade open. (*Id.* ¶ 26.)  The blade had a hooked end. (*Id.*)  Ochoa reached into his other pocket, grabbed a second knife, and snapped the blade open. (*Id.* ¶ 27.)  Ochoa held the knives with the blades extending from the bottom of his hands as he got into fighting position. (*Id.*)  At this point, Ochoa was moving around, not backing up, going side to side and was 10 to 15 feet from Palafox. (*Id.* ¶ 28.)  When Ochoa pulled knives out, Palafox commanded Ochoa "drop the knives, drop the knives." (*Id.* ¶ 35.)  Officer Serrano grabbed his taser and shot the taser at Ochoa's center mass, but Ochoa did not receive the energy as the prongs did not stick into his body due to the body armor. (*Id.* ¶ 60.)  Ochoa grabbed the wires, wrapped them, and just pulled them out. (*Id.* ¶ 29.)  Ochoa used one of the knives to cut the taser lead wires. (*Id.*)  Ochoa started walking toward a restaurant in the parking lot and the police officers followed him. (*Id.* ¶ 61.)  Serrano fired a second shot with the taser backwards that did not have any effect on Ochoa. (*Id.*)

Ochoa then began moving forward toward the police. (*Id.* ¶ 31.) Ochoa went toward Officer Kavathas in a pace "less than a run, more than a walk." (*Id.* ¶ 32.) Palafox was concerned about Officer Kavathas' safety. (*Id.* ¶ 33.) The police began to back up as Ochoa started moving towards them. (*Id.* ¶ 34.) Palafox feared for Officer Kavathas' life at that moment, and he discharged eight rounds of his service weapon at Ochoa's right side because he was wearing body armor that covered his center mass, and struck Ochoa. (*Id.* ¶¶ 36, 40, 43.) Palafox saw Ochoa go down to the ground and Ochoa was still making stabbing motions with his knife, so he discharged his weapon again firing an additional three rounds. (*Id.* ¶¶ 37, 43.) At that point, Ochoa dropped the knife, and Palafox stopped shooting. (*Id.* ¶ 38.) While Palafox was shooting, Officer Serrano "also discharged rounds." (*Id.* ¶ 39.) After the shooting, Officer Kavathas rendered aid to Ochoa. (*Id.* ¶ 81.)

## IV. Discussion

### A. Count Three: Fourth Amendment excessive force against Defendants Palafox and Serrano

Defendants assert that they are entitled to summary judgment on the Fourth Amendment excessive force claim because the force used by the officers was objectively reasonable because Ochoa posed an immediate threat to the safety of the Defendant Officers, other officers at the scene, and multiple civilians in the area. Defendants assert that the threat was clear because Ochoa was holding knives with four inch blades in attack positions in each hand, was armed with a handgun, was wearing body armor, and was charging at the officers making stabbing/slicing motions with the knives, and was within 8-10 feet of the officers when the officers shot him. Defendants assert that the officers were in police uniforms, in marked vehicles, gave multiple commands and warnings to Ochoa, and attempted lesser uses of force. Defendants assert that they knew Ochoa was committing a felony by being a prohibited possessor and was resisting arrest, and was committing aggravated assault at the time the officers shot him. Defendants assert that *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906 (9th. Cir. 2024)

supports that their conduct was reasonable under the circumstances.  Defendants further assert that they are entitled to qualified immunity because the law was not clearly established that their behavior violated the Fourth Amendment.

### 1.    Legal Standards

#### a.    Excessive Force

If the alleged use of excessive force was applied during the plaintiff's arrest, the Fourth Amendment objective-reasonableness standard applies.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Under this standard, a court considers certain objective factors and does not consider the defendant officer's intent or motivation.  *See id.* at 397, 399 ("subjective concepts like 'malice' and 'sadism' have no proper place in [this] inquiry").

Under the Fourth Amendment standard, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  When determining whether the totality of the circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  The inquiry is "whether the officers' actions are 'objectively reasonable' considering the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (citations omitted).

#### b.    Qualified Immunity

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity analysis formerly required the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry."  *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).  The "constitutional inquiry" asks whether, when taken in the light most favorable

to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201-02.

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026); *see also Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023). While a case need not be directly on point, existing precedent must "place the statutory or constitutional question beyond debate." *Waid,* 87 F.4th at 387 (cleaned up). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal citations omitted). "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal citation omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (cleaned up). "[T]his obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context" "because a categorical statement that conduct obviously violates the Fourth Amendment is particularly hard to make when officers encounter suspects every day in never-before-seen ways, including countless confrontations that yield endless permutations of outcomes and responses." *Id.* (cleaned up). As such, Fourth Amendment violations must be beyond debate to be considered obvious. *Id.* (citation omitted); *see also Zorn,* 2026 WL 795469, at *2 (citation omitted) ("A right is not clearly established if existing precedent does not place the constitutional question 'beyond debate.'"); *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021) ("Because excessive use of force is a highly fact-specific inquiry, even when we determine excessive force was used, 'police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.'") (quoting *Kisela v. Hughes*,584 U.S. 100, 104 (2018)).

"Instead, a clearly established right usually requires controlling authority or a robust consensus of cases of persuasive authority." *Id.* (citations omitted). "Plaintiffs must either explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* With regard to the "reasonableness of lethal force as a response to vehicular flight, . . . this is an area in which the result depends very much on the facts of each case." *Plumhoff*, 572 U.S. at 777. The Court must "view the facts as an officer would have encountered them on the night in question, not as an ex post facto critic dissecting every potential variance under a magnifying glass." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

Courts "have discretion to address the 'clearly established' prong of the qualified immunity test first; if [they] conclude that the relevant law was not clearly established, [they] need not address the other prong concerning the underlying merits of the constitutional claim." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (internal quotation marks omitted). The Court will exercise its discretion to begin with the clearly established prong here because it is dispositive.

### 2.    Analysis

Here, Plaintiffs did not a file a response to the Motion for Summary Judgment and therefore did not meet their burden of establishing that the law was clearly established that Defendants violated the Fourth Amendment under the circumstances of this case. *See, e.g.*, *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) ("The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." ) (cleaned up); *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue.").

Moreover, Defendants' argument that *Napouk v. Las Vegas Metropolitan Police*

*Department* demonstrates that the law was not clearly established is persuasive. In *Napouk*, the Ninth Circuit Court of Appeals found that the officers acted reasonably in using deadly force when they "reasonably perceived"[2] that a man "was holding a long, bladed weapon, walking toward one of them and failing to follow commands to stop or to drop the weapon" and "[a]t the moment they fired, [the man] was within ten feet of them, had ignored their commands for more than five minutes, and had moved at them several times, causing them to retreat with increasing frequency as the encounter went on."  123 F.4th 906, 916 (9th Cir. 2024).  The Ninth Circuit furthers stated, "In a case like this one . . . where the suspect is brandishing what is reasonably understood to be a lethal weapon and advancing towards the officers, that he was emotionally disturbed does not negate the serious threat he exhibited.  If anything, his mental state and erratic behavior made [the suspect] more of a threat to the officers because he clearly was not behaving rationally or in a predictable manner *when he repeatedly approached them with a bladed weapon. Id.* at 921 (emphasis in original).

In *Napouk*, the Ninth Circuit Court of Appeals found both that the Defendant Officers conduct in shooting the suspect under these circumstances was reasonable and that there was no clearly established law demonstrating that their conduct violated the Fourth Amendment.  *See generally id.*

The facts of the instant case are not meaningfully different than those in *Napouk* where the officers conduct was found reasonable.  Because Plaintiffs have not identified any factually similar cases to qualify as Fourth Amendment precedents that "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant[s'] place, that what [they were] doing violates federal law," *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017), Defendants are entitled to qualified immunity on the Fourth Amendment claim.

---

[2] In *Napouk*, the man was actually carrying a plastic sword.  123 F.4th at 916.

### B.    Count Four: *Monell* claim against the City of Nogales

Defendants assert that there is no evidence that the City failed to train or supervise the Defendant police officers.

To state a claim based on a policy, practice, or custom of Defendant City of Nogales, Plaintiffs must allege facts showing (1) that his constitutional rights were violated by an employee or employees of the Defendant; (2) that the Defendant has customs or policies that amount to deliberate indifference; and (3) that the policies or customs were the moving force behind the violation of Ochoa's constitutional rights in the sense that the Defendant could have prevented the violation with an appropriate policy. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002). "Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation." *Id.* at 1194 (quotations omitted).

A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To support a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the local government's failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference may be shown if there are facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (citing *Canton*, 489 U.S. at 390). While, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to

train" *Connick*, 563 U.S. at 62, a plaintiff may still prove a failure-to-train claim without showing a pattern of constitutional violations where a violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal citation omitted). In such instances, "failing to train could be so patently obvious that [an entity] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 F.3d at 64.

A plaintiff may prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded. *See Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992); *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).

Here, Plaintiffs have not produced any evidence demonstrating that the City failed to train or supervise its employees leading to a violation of Ochoa's constitutional rights. Accordingly, summary judgment will be granted in favor of the City as to this claim.

### C. Count Five: Fourteenth Amendment loss of family relationship claim against Defendants Palafox, Serrano and City of Nogales

Defendants assert that they are entitled to summary judgment on Plaintiffs' Fourteenth Amendment loss of familial association claim because there is no evidence that Sergeant Palafox and Officer Serrano acted with anything other than legitimate law enforcement objectives of self-defense, defense of each other, and defense of the other police and citizens in this congested area.

"The substantive due process right to family or to familial association is well established," and the state's interference with this liberty interest without due process of law is remediable under § 1983. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (citation omitted). "To amount to a violation of substantive due process, however, the harmful conduct must shock [ ] the conscience' or 'offend the community's sense of fair play and decency.'" *Rochin v. California,* 342 U.S. 165, 172–73 (1952). The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference" or (2) with a "purpose to

harm*"* for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Under the first situation, if a defendant is in a position "[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "shock the conscience." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). "On the other hand, when an officer makes a snap judgment because of an escalating situation," then the courts apply the "purpose-to-harm" standard. *Id.* (quoting *Wilkinson*, 610 F.3d at 554).

Under Supreme Court precedent, conduct that "shocks the conscience" includes conduct that violates the "decencies of civilized conduct," that is "brutal" or "offensive" or "arbitrary." *Cnty. of Sacramento*, 523 U.S. at 846-47 (citations omitted). Negligence, however, "is categorically beneath the threshold of constitutional due process." *Id.* at 849. Whether conduct such as recklessness or gross negligence shocks the conscience "is a matter for closer calls." *Id.* at 849 (noting that rules of due process are not "subject to mechanical application" and depend on the particular facts in a case).

Here, the purpose-to-harm standard applies because the evidence supports that the officers had to make snap judgments in an escalating situation. *I.A. v. City of Emeryville*, No. 15-cv-04973-DMR, 2017 WL 952894, at *10 (N.D. Cal. Mar. 13, 2017) ("A court may determine at summary judgment whether the officer had time to deliberate . . . or instead had to make a snap judgment because he found himself in a quickly escalating situation . . . 'so long as the undisputed facts point to one standard or the other.'") (citations omitted).

Moreover, the evidence shows that Defendants acted with the purpose of legitimate law enforcement objectives. "Legitimate objectives can include arrest, self-protection, and protection of the public," and "[i]llegitimate objectives include 'whether the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).

Here, there is no indication in the record that Defendants had any improper or ulterior motives when they shot Ochoa, and there is no evidence in the record that Ochoa was clearly harmless or subdued when the officers shot him.

Because there are no disputed issues of material fact, summary judgment will be granted in favor of Defendants as to Count Five.

**D.    Count One: Assault and battery resulting in wrongful death against Palafox, Serrano, and the City of Nogales (based on vicarious liability)**

Defendants argue that they are entitled to summary judgment on Plaintiffs' battery claims because Arizona's justification defenses protect their conduct. Under Arizona law, "[n]o person . . . shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." Ariz. Rev. Stat. § 13-413. Law enforcement officers are justified in using deadly force "when the peace officer reasonably believes that it is necessary [t]o defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force." *Id*. § 13-410(c)(1). Defendants may also rely on presumptions in Arizona Revised Statutes § 12-716, which sets forth presumptions concerning crime victims and law enforcement officers. *Ryan v. Napier*, 425 P.3d 230, 241 (Ariz. 2018). If a presumption applies, the burden shifts to the plaintiff to produce evidence to rebut the presumption, although the defendant retains the burden of persuasion. *Id.* The relevant presumption applies if an officer proves by a preponderance of the evidence that the officer used deadly physical force to "[p]rotect himself or another person against another person's use or attempted use of physical force or deadly physical force." Ariz. Rev. Stat. Ann. § 12-716(A). The presumption also applies to the City if it hired or trained an officer who used force under these circumstances. (*Id.*)

Here, Defendants have shown by a preponderance of evidence that Arizona's justification statutes support the shooting as Ochoa was wielding knives at and walking toward one of the police officers when the Defendant officers shot him. Plaintiffs do not rebut this presumption. Accordingly, Defendants are entitled to summary judgment on the claims in Count One.

- 14 -

**E.    Count Two: Negligent Supervision against the City of Nogales**

Defendants assert that they are entitled to summary judgment as to Count Two because there is no evidence that the Defendant officers were negligently trained or supervised.  Plaintiffs did not respond and did not produce any evidence demonstrating that the Defendant officers were negligently trained or supervised.  Accordingly, summary judgment will be granted as to Count Two.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 35) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 25th day of March, 2026.

Honorable Cindy K. Jorgenson
United States District Judge

- 15 -